# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| LEE CATLEDGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 05065 |
| | ) | |
| RUSSELL MCKNIGHT, DANIELLE | ) | Judge John J. Tharp, Jr. |
| KAPPEL, and DALE MARTIN. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this case alleging that three Chicago police officers unreasonably seized the Plaintiff, Lee Catledge, and illegally searched his car, the defendant officers move for summary judgment. They argue that the seizure was a permissible *Terry* stop and that the subsequent search of the vehicle by two of the officers was supported by probable cause. The officers' motion is granted as to the stop, but it is denied as to the search. A reasonable jury could conclude that the officers searched the car and its contents without probable cause.

## FACTS

On August 20, 2008 at 8:11 a.m., Chicago police officers Russell McKnight, Dale Martin, and Martin's partner, Danielle Kappel,[1] responded to a 911 call. The dispatcher from the Office of Emergency Management and Communications (OEMC) stated that a woman had reported that a suspicious man was videotaping her and other women. The dispatcher further relayed that the 911 caller reported that the man was sitting in a white Ford Taurus station wagon

---

[1] Defendant Kappel testified that she does not recall responding to the 911 call or being present at the scene. However, for purposes of summary judgment, the defendants do not dispute that Kappel was the other officer assigned with Martin to beat number 1206A and that she and Martin were the plain-clothes officers who searched the plaintiff's car.

parked just west of the intersection of West Madison and Green Streets, facing westbound on Madison. The dispatcher relayed that the caller described the man as an African American man in his late forties with a medium brown complexion and short hair, wearing a cap. The dispatcher also stated that the caller said she felt in fear of her safety and that the same man had been at that location every day videotaping women.

When Officer McKnight arrived at the intersection, he saw a man, whose physical appearance matched the description that the 911 caller had provided, sitting in a white station wagon parked on West Madison just west of Green Street. McKnight pulled his marked police vehicle (an ATV), lights flashing, behind the station wagon. He approached the man sitting in the driver's seat, who was Lee Catledge, the plaintiff. Catledge complied with McKnight's requests that he exit the vehicle and provide identification. McKnight informed Catledge that a woman had called 911 and reported that he was videotaping her. Catledge responded that his video camera was not functional and that he had not been filming any woman, and that he had been pointing his camera at a helicopter hovering above him. Catledge Dep. Tr. 92:10 93:4; 94:14 – 95:1, Def. Ex. E, Dkt. #255-6.[2]

Several plain-clothes officers, including Martin and Kappel, arrived at the scene. Just before or just after their arrival, Catledge offered his video camera up for inspection, and the officer who inspected it (whose identity is not known) confirmed that the camera was inoperable. Martin and Kappel immediately began to search Catledge's car.[3] They also searched inside the

---

[2] Catledge testified in his deposition he pointed camera at the helicopter to make it seem as though he was filming it, so that it would go away—he thought the same helicopter had been hovering over his house on a prior occasion— but the record does not reflect whether he explained his reasoning to the officers. Catledge Dep. Tr. 70-72, Def. Ex. E, Dkt. # 255-6,

[3] According to Catledge, he asked the officers why they were searching his car, and where the search warrant was, and Kappel exclaimed: "Patriot Act!" But Catledge failed to cite any admissible evidence for this assertion.

computer bag that was in the car and found many wires, plugs, and batteries. A female plain-clothes officer loudly said, "What were [you] going to do with this stuff?" Catledge responded that the batteries were for the video camera and the cord was to plug in his computer. At some point Catledge told the officers that he was a messenger and parks in that location most of time, waiting for dispatch to page him for pick-ups or deliveries. After searching the car for five to seven minutes, Martin and Kappel left the scene, leaving McKnight and another officer with Catledge. A few minutes later, the plain-clothes officers returned and searched the car again for another five to seven minutes.

McKnight asked the OEMC dispatcher to re-contact the 911 caller; the caller, who was working at 651 West Washington Street, met McKnight and another officer in front of her building. The caller did not wish to file a written complaint against Catledge. McKnight informed Catledge that he was free to leave, and the officers themselves left the scene. The entire encounter lasted up to 22 minutes.[4] Officer McKnight did not participate in the search.

## DISCUSSION

The Fourth Amendment protects individuals "against unreasonable searches and seizures." Catledge alleges that the officers violated his Fourth Amendment rights when they

---

[4] The defendants object to this number, contending that the evidence (Catledge's deposition testimony) shows a total duration of "12 to 20 minutes." However, 12 is clearly incorrect, given the time of the 911 call (8:11) and McKnight's immediate response. The searches alone lasted up to 14 minutes. And McKnight was still communicating with dispatch from the scene at 8:39, shortly before he released Catledge. Viewing the evidence in the light most favorable to Catledge, the stop clearly could have lasted up to 22 minutes. At any rate, Catledge does not argue that the stop lasted longer than *Terry* permits, and the Supreme Court has upheld an investigatory stop of 20 minutes so long as the police do unnecessarily prolong the detention. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985). The Seventh Circuit has upheld longer stops. *See United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011).

seized him and searched his car. The officers move for summary judgment, arguing that both the seizure and search were reasonable and, further, that they are entitled to qualified immunity.

Summary judgment should be granted when the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014). The Court construes the evidence in the light most favorable to the non-moving party, Catledge, and draws all reasonable inferences from the evidence in his favor. *Matz*, 769 F.3d at 522.

In responding to the motion for summary judgment, Catledge, who is representing himself, attempted to dispute many of the material facts as set forth by the defendants in their statement of undisputed material facts pursuant to Local Rule 56.1(a)(3). However, the Court has largely disregarded his objections to the extent that they are premised on Catledge's own lack of "knowledge or information sufficient to dispute" them. Catledge's "insufficient knowledge" is not a competent rebuttal to facts set forth by the defendants supported with citations to the record of admissible evidence. *See* L.R. 56.1(b)(3)(B) (requiring disputes of fact to be supported with "specific references to the affidavits, parts of the record, and other supporting material relied upon"); *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002) (district court properly deemed admitted facts "supported with citations to the record" where the opposing party had only "stated they had insufficient knowledge to admit or deny the facts").

The Court declines, however, the defendants' request to disregard all additional facts asserted by Catledge in his response to the defendants' fact statement. It is within the Court's discretion to strictly enforce Local Rule 56.1(b)(3)(C), requiring that additional facts be set forth in a statement of separately numbered paragraphs. *See Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710-11 (7th Cir. 2015). But given Catledge's *pro se* status and his

good-faith attempt to set forth additional facts, those facts, to the extent they are material and properly supported, are considered.

## I. The Seizure of Catledge's Person

The defendants contend that Catledge's claim of unreasonable seizure fails because, as a matter of law, the stop was supported by reasonable suspicion. *See Terry v. Ohio*, 382 U.S. 1 (1980). Catledge, on the other hand, argues that there was no basis for an investigatory stop because "[o]bserving someone sitting in a legally parked car, without more, cannot justify a *Terry* stop."

But there was more—specifically, the report of a 911 caller that a man had been filming women at the same spot, day after day. Ordinarily a seizure requires probable cause to believe the suspect has committed a crime, but *Terry* authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion that criminal activity is afoot. *Matz*, 769 F.3d at 522 (citing *Terry*, 392 U.S. at 21–22). Such a brief detention is permitted when it demands only a limited intrusion into an individual's privacy and rests on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (citing *Terry*, 392 U.S. at 21). There must be objective justification for the stop—more than a generalized suspicion or "hunch." *Id*.

That threshold is easily met here. The police officers in this case detained Catledge on more information than simply observing him sitting in a legally parked car. They were responding to a report of suspicious activity, and they independently corroborated details of the caller's tip when they viewed someone who matched Catledge's description, at the same location and in the same kind of vehicle; they also quickly verified that he had a video camera. *Alabama*

*v. White*, 496 U.S. 325 (1990) holds that an anonymous[5] telephone tip corroborated by independent police work provides reasonable suspicion for an investigatory stop. *Id.* at 331; *see United States v. Bullock*, 632 F.3d 1004, 1013 (7th Cir. 2011) ("[A]n anonymous tip, adequately corroborated, may provide sufficient indicia of reliability to provide reasonable suspicion for an investigatory stop."). The report to 911 with its detailed description of the suspicious person, which was precisely corroborated by the circumstances at the scene, provided an objective basis for suspicion that Catledge was engaged in criminal activity such as stalking or disorderly conduct.[6]

Although, as Catledge rightly notes, videotaping in public is usually lawful, simply filming—or appearing to film—people was not what aroused the reasonable suspicion. A caller reported that she felt fearful because he was filming her and that he filmed women—just women—every day in the same spot. In *United States v. Raibley*, 243 F.3d 1069 (7th Cir. 2000), the Seventh Circuit upheld the *Terry* stop of a man who was observed surreptitiously videotaping a seventeen year-old Wal-Mart employee. The officer stopped the suspect on suspicion that he had committed the Illinois offense of stalking. The suspicion was based on the report of the Wal-Mart manager who witnessed the covert videotaping of the employee a single time, the officer's knowledge that the employee did not know the suspect and did not consent to being videotaped, and the suspect's flight from the Wal-Mart upon being detected. *See id.* at 1074-75. Although

---

[5] Here, the informant was not wholly "anonymous," in the sense that she provided her contact information, but there is nothing in the record to suggest that she was previously known to the officers and had established a record of credibility, *see Adams v. Williams*, 407 U.S. 143, 146–147 (1972).

[6] The crime of stalking occurs when a person knowingly and without justification (1) places a person under surveillance or follows another person on two or more separate occasions and (2) places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint. 720 ILCS 5/12-7.3(d). Disorderly conduct under Illinois law occurs when a person commits "any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1.

these facts did not establish all the elements of stalking, they were sufficient to support the investigatory stop. *Id*. at 1074. Videotaping plus other circumstances can also be disorderly conduct under Illinois law, to the extent that the conduct disturbs or alarms another person or causes a breach of peace. *See Reher v. Vivo*, 656 F.3d 772, 776 (7th Cir. 2011) ("[V]ideotaping other people, when accompanied by other suspicious circumstances, may constitute disorderly conduct"); *see* 720 ILCS 5/26-1.[7] Here, the 911 caller specifically reported that Catledge's conduct made her afraid; her apprehension and her report of his regular presence at the same site taping women were sufficient to objectively arouse reasonable suspicion.

Because the 911 caller reported that the videotaping of women occurred regularly, and that she was fearful, sufficient circumstances beyond the otherwise innocent conduct of videotaping in public warranted an investigative stop by the police on suspicion of stalking or disorderly conduct. The officers therefore are entitled to judgment as a matter of law on Catledge's claim that he was unlawfully seized.[8]

## II. The Search of Catledge's Car

Catledge also claims that the defendants violated his Fourth Amendment rights by searching his car without probable cause. The defendants argue that they are entitled to summary judgment because they had probable cause for the search, or, alternatively, because they had arguable probable cause and therefore are entitled to qualified immunity.

The police lawfully seized Catledge for an investigatory stop, but *Terry* does not provide justification for the warrantless search of Catledge's car. *Terry* authorizes only a limited

---

[7] The breach-of-the-peace element requires nothing more than the unreasonable harassment of a single person, even in a nonpublic location. *Maniscalco v. Simon*, 712 F.3d 1139, 1144 (7th Cir. 2013).

[8] The Court necessarily agrees as well then that the defendants are entitled to qualified immunity as to Catledge's detention.

7

protective pat-down of the subject's body and personal effects, including a bag. *See United States v. Leo*, 792 F.3d 742, 749 (2015). Moreover, during a roadside encounter, *Terry* authorizes a protective search of the subject's vehicle where there is a belief that that subject could gain immediate access to weapons. *Id.*; *see Michigan v. Long,* 463 U.S. 1032, 1047-50 (1983). The defendants do not argue, however, that their search of Catledge's vehicle was justified as a protective *Terry* search, a sensible approach given that the record supplies no reason to suspect that Catledge might have any weapons in the car; moreover, he exited the car as requested by McKnight at the very start of the encounter and did not have immediate access to the car's contents. Therefore, no exception to the probable cause requirement can be invoked with respect to the search of Catledge's car. The automobile exception provides an exception to the *warrant* requirement, but under that theory, the officers may search a vehicle only when there is probable cause to believe that it contains contraband or evidence of a crime. *Alabama v. White*, 496 U.S. 325, 332 (1990); *California v. Carney*, 471 U.S. 386, 390 (1985). The reason for the exception is based not only on the inherent mobility of a vehicle (even if the suspect is temporarily unable to access it) but also on the diminished expectation of privacy in one's vehicle compared to other spaces. *United States v. Zahursky*, 580 F.3d 515, 523 (7th Cir. 2009).

The defendants argue that the automobile exception applies here because they had probable cause to search Catledge's car for evidence of a crime. But what crime? Stalking and disorderly conduct, presumably, but the defendants did not arrest Catledge for either of those crimes and they never argue that they had probable cause to do so. They make no attempt to articulate what circumstances elevated the encounter from an investigatory stop to one with

probable cause to believe that Catledge's car contained evidence of a crime.[9] Rather, they argue that based on the information they had received, they could reasonably have expected to find additional cameras, surveillance equipment, and other "evidence related to the offenses of stalking or disorderly conduct." Mem., Dkt. # 256 at 13. But that can be true only if there was already—before the search—probable cause to believe that Catledge was committing one of those offenses. A search cannot be justified solely by claiming that there is a reasonable basis to believe evidence of criminal activity may be found; there must exist already probable cause to believe that a crime has been committed. As explained in Professor LaFave's *Search and Seizure* treatise, to establish probable cause to search, there must be:

> a sufficient nexus between (1) criminal activity, and (2) the things to be seized, and (3) the place to be searched. . . . This is because even if there is probable cause—or even absolute certainty—that certain described items are presently to be found in a certain described place, a lawful basis for search has not been established unless it is also shown to be probable that those items constitute the fruits, instrumentalities, or evidence of crime. In the absence of such a showing, the described items are not a legitimate object of a search. Illustrative is *Kellen v. State*, [49 Ala. App. 475, 273 So. 2d 235 (1972)] where the affidavit for a warrant to search for lumber stated that the defendant had been seen going to and coming from his home during the nighttime and that a truckload of lumber had been unloaded at his residence during the hours of darkness. This certainly made it sufficiently probable that the lumber would be found there, but the court properly ruled that the search pursuant to the warrant was nonetheless illegal. Because the affidavit failed to connect the lumber with any criminal offense, this aspect of the probable cause requirement was lacking.

---

[9] When a lawful *Terry* stop is initiated, one of three things must happen next: "(1) the police gather enough information to develop probable cause and allow for continued detention, (2) the suspicions of the police are dispelled and they release the suspect; or (3) the suspicions of the police are *not* dispelled, yet the officers have not developed probable cause but must release the suspect because the length of the stop is about to become unreasonable." *United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015) (internal citations omitted). But officers are not entitled to "gather information" or "develop" probable cause by conducting a full search of the suspect, *see id.*, or, here, a search of the car. Probable cause for the search must exist before it occurs.

9

LaFave, 2 *Search & Seizure* § 3.7(d) (5th ed.). *See also, e.g., United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1263 (9th Cir. 2012) ("For a finding of probable cause to satisfy this nexus requirement, there must be a fair probability both that a crime has been committed and that evidence of its commission will be found in the location to be searched."); *United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st Cir. 1996) ((government "must demonstrate probable cause to believe that a particular person has committed a crime—the commission element—*and* that enumerated evidence relevant to the probable criminality likely is located at the place to be searched—the nexus element") (emphasis in original, internal quotation marks omitted)).

Whether there was probable cause to search Catledge's car, then, depends first on whether there was probable cause to believe that Catledge had committed the offenses of stalking or disorderly conduct.[10] Because the defendants omit any direct discussion of this question, the Court has given substantial consideration to whether the defendants should be deemed to have waived this argument. But as discussed in more detail below, there is such a high degree of overlap in this case between the questions of probable cause to believe that Catledge committed a crime and probable cause to believe that evidence of that crime would be found in Catledge's car that the defendants essentially make the former argument in the course of making the latter

The officers argue that they had probable cause to search the car because the 911 call, as corroborated by their observations at the scene, Catledge's admission that he had a video camera,

---

[10] This is not to say that the two inquiries (probable cause to arrest and probable cause to search) are the same. Probable cause to search also requires "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). *See also Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."). More particularly, "[t]he automobile exception requires probable cause that the vehicle contains evidence of criminal activity."*United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014).

and his contradictory statements that his camera didn't work but he was pointing it at a helicopter, provided a reasonable basis to believe that Catledge committed a crime, either stalking or disorderly conduct, and by reasonable inference, that evidence of that crime would be found in Catledge's car. The officers contend: "The 911 caller's report that Plaintiff was filming her and other women at that location everyday suggests that Plaintiff's vehicle likely contains other evidence of stalking or disorderly conduct. . . . It is not difficult to conceive what other types of evidence Defendant could reasonably have expected to find in Plaintiff's vehicle—*e.g.*, cameras, videotapes, binoculars, surveillance footage, photographs, diaries or notes, diagrams or photographs of the victim's home or workplace." Mem., Dkt. # 256 at 13-14; *see also* Reply, Dkt. # 262at 7-9, 12 ("[T]he facts that Plaintiff matched the description of the suspect provided by the 911 caller and that he admitted he was in possession of a video camera was enough . . . . What is more, Plaintiff responded in an evasive manner when Officer McKnight confronted him about filming the woman, insisting both that his camera was broken and that he was actually pointing it at a helicopter.").

That said, the officers did not personally observe any incriminating behavior by Catledge. As previously noted, there is nothing illegal about possessing a video camera or filming on a public street. By analogy, possession of large amounts of concealed cash or cell phones is not in itself incriminating and therefore does not supply probable cause. *United States v. Moreland*, 703 F.3d 976, 987 (7th Cir. 2012); *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006); *see also Spencer v. Pistorius*, 605 F. App'x 559, 566 (7th Cir. 2015) ("[C]ash and phones are not inherently incriminating and cannot alone supply probable cause to search."). The defendants do not claim to have witnessed Catledge filming (or appearing to film) any women, let alone on multiple occasions, or doing anything else with the camera that objectively could be considered

11

suggestive of either stalking or disorderly conduct. Nor did they view any videotape supporting the 911 caller's report that he filmed women; indeed, Catledge's claim that the camera was inoperable was borne out by their inspection.

The officers emphasize Catledge's "contradictory" or "evasive" statements at the scene as support for probable cause, but their argument depends on their own inferences, ones a jury would not be required to draw. Specifically, Catledge stated that his video camera was not working, yet he also explained that he had been "pointing it" at a helicopter overhead. According to the defendants, "a police officer could reasonably infer that if the video camera Plaintiff presented was nonfunctional, there was a fair probability Plaintiff had another video camera in his car that was working [because i]t does not make sense that Plaintiff would be using a nonfunctioning camera." Mem., Dkt. # 256 at 13. That is one inference that can reasonably be drawn from Catledge's explanation, but not the only one. The presence of a functioning camera inside the car was not necessarily made more likely by the presence of a nonfunctional camera in Catledge's hand. (Moreover, Catledge did not claim to have been "using" the camera, just "pointing it"; granted, this would be unusual behavior, but not necessarily incriminating.) The defendants' argument assumes that Catledge in fact had been filming at some point, but the officers could not know one way or the other—nor, for that matter, could the complaining witness. An equally, if not more, reasonable inference to draw from the non-working camera, and the one more favorable to Catledge, is that he had not been filming at all—not that he had been filming with a now-hidden second camera. The officers' surmise that there might be a second camera is little more than speculation and does not meet the threshold of probable cause. *See Fox v. Hayes*, 600 F.3d 819, 837 (7th Cir. 2010) (explaining that speculation adds no weight to probable-cause analysis).

Because the officers did not observe any incriminating conduct, and Catledge's statements at the scene were not incriminating (when viewed in the light most favorable to Catledge), the defendants are left with the 911 caller's statements to provide a basis for probable cause to believe that Catledge was stalking women or breaching the peace. The statement of a reasonably credible eyewitness that someone has committed a crime is sufficient to establish probable cause to arrest. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 716 (7th Cir. 2013); *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 680 (7th Cir. 2007) ("In making a decision to arrest someone for criminal conduct that he did not witness, a police officer may rely on information provided to him by the victim or by an eyewitness to the crime that the officer reasonably believes is telling the truth."). Indeed, no further independent investigation by police is required so long as the information is credible. *Abbott*, 705 F.3d at 716.

But here, the officers fail to establish as a matter of law that they had a "reasonably credible eyewitness." A jury would not be required to conclude that the 911 caller's report gave them an objectively reasonable basis to believe that Catledge committed any crime, without probing the caller's reliability or her basis for knowledge or getting some detail about what she observed. The officers had no prior experience with her and did not question her about her allegations and her basis for knowledge. The officers corroborated only innocent facts such as Catledge's appearance, his location, and his possession of a camera. *See United States v. Robinson*, 724 F.3d 878, 884-85 (7th Cir. 2013) (tipster's account not "corroborated" by information that does not shed light on whether criminal activity was occurring); *United States v. Dismuke*, 593 F.3d 582, 587–88 (7th Cir. 2010) (corroboration of "innocent facts" does not directly bolster the informant's claim that the subject was engaged in criminal activity). That the officers corroborated innocent details including Catledge's appearance and location does not

13

mean they were necessarily entitled to credit her account of his suspicious conduct wholesale, and what they observed of Catledge on the scene did not, as a matter of law, tip the totality of the circumstances in favor of probable cause. A jury could draw different inferences from the facts than the defendants have.

In asserting that they had probable cause to search, the officers primarily rely on *Graham v. Village of Niles*, No. 02 C 4405, 2003 WL 22995159 (N.D. Ill. 2003). There, the district court concluded that officers had probable cause to arrest the plaintiff for disorderly conduct for videotaping in public "accompanied by other suspicious circumstances." *Id*. at * 6 (citing Illinois cases). The circumstances known to the police were: (1) a witness's report that an African American male in a Grainger truck was videotaping women's breasts at a Target store in Niles; (2) it was past sunset; (3) the suspect was found sitting a Grainger truck in the Target store parking lot with a video camera; (4) the suspect gave evasive answers about what he was doing; and (5) the tape of the video camera contained images zooming in on women's breasts as they entered and exited the store. *Id*. at 7. Based on these facts, the court held that Graham's activity was "more than sufficient to create probable cause for an arrest for disorderly conduct." *Id.* (the "police knew that Graham had frightened at least one woman . . . and they knew that he had been 'messing around' with a video camera, exhibiting behavior similar to peeping-toms and stalkers").

As Catledge rightly points out, however, *Graham* is not on all-fours with this case because here, the officers had no confirmation from videotape that Catledge had been filming at all, let alone filming women, every day. To the contrary, since they knew that the video camera was inoperable, they knew that Catledge had not been videotaping anyone, at least that morning. Furthermore, in *Graham,* the police arrested the plaintiff before they conducted the search that

the plaintiff challenged; that search was therefore incident to the arrest the court had deemed valid.[11] In this case, probable cause was needed to support the warrantless search; there was no preceding arrest. Because the search was justified as incident to a lawful arrest, *Graham* does not address the issue of whether there was probable cause to believe that additional evidence of the plaintiff's criminal conduct would be found in the car.

Because the searching officers have not pointed to circumstances that require the conclusion as a matter of law that they had probable cause to search inside Catledge's car, they are not entitled to summary judgment on that issue.[12] On the current record, there is room for difference of opinion as to the reasonable inferences to be drawn from the facts, and therefore summary judgment as to the search is inappropriate. *See Washington*, 481 F.3d at 551.

Nevertheless, the officers have established that they are entitled to qualified immunity based on arguable probable cause to search the vehicle. Qualified immunity requires a two-part inquiry into whether the facts, viewed in a light most favorable to the injured party, demonstrate that the conduct of the officers violated a constitutional right, and whether that right was clearly established at the time the conduct occurred. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015). "A plaintiff bears the burden of establishing that the constitutional right was clearly established." *Id.* Qualified immunity applies unless "existing precedent has placed the statutory or constitutional question beyond debate. . . . Put simply, qualified immunity protects

---

[11] In *Graham*, one of the police officers removed the camera from the plaintiff's truck, reviewed the video recorded on the camera, and confirmed that the content of the video matched the initial report that police had received. The removal of the video camera from the truck was not challenged by the plaintiff, so no argument was made that the police search of the vehicle actually preceded the existence of probable cause.

[12] Officer McKnight, however, is entitled to summary judgment based on the undisputed fact that he did not take part in either search of Catledge's vehicle.

"all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation marks and citations omitted).

Even when an officer lacks probable cause, he is still entitled to qualified immunity when a reasonable officer could have believed that probable cause existed in light of well-established law—that is, when there is "arguable" probable cause. *Bruce v. Guernsey*, 777 F.3d 872, 878-79 (7th Cir. 2015); *Humphrey v. Staszak,* 148 F.3d 719, 725 (7th Cir. 1998). Here, Catledge has not met his burden of showing that existing precedent places the unlawfulness of the search beyond debate, either with reference to closely analogous cases in which a police officer was found to lack probable cause, or by establishing that the search so obviously constituted misconduct that no reasonable officer could have believed it was lawful. *See Doe*, 782 F.3d at 915; *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006). Even crediting Catledge's version of events relating to his encounter with the defendants, a reasonable officer could have believed that there was probable cause to believe that Catledge had violated the stalking or disorderly conduct laws and that evidence of such crimes would be found in his car.

The defendants point to the Seventh Circuit's opinion in *Reher v. Vivo*, where the Court of Appeals upheld qualified immunity for a police officer who arrested a suspect for disorderly conduct based on a woman's report that she saw him videotaping children and that she had seen him in the park several times before watching the children. 656 F.3d at 777. The officer also knew that another neighbor worried that the suspect was a sex offender or "peeping Tom." *Id*. Although these reports were too vague to constitute probable cause for a disorderly conduct arrest, a reasonable officer could have believed, mistakenly, that the suspect was harassing children and alarming their parents, thereby committing disorderly conduct. *Id*. at 778. In reaching this conclusion, the Court of Appeals explained that while videotaping others in and of

16

itself is not illegal in Illinois, it may constitute disorderly conduct where it is accompanied by suspicious conduct and expressly noted "the lack of case law on point" to guide officers in assessing where the line between acceptable and unacceptable videotaping of others may lie. *Id.* at 776.

Based on *Reher*, the officers in this case would have been entitled to qualified immunity if they had arrested Catledge based on the 911 caller's tip and what they saw and heard at the scene. And arguably, they had more to go on than did the officer in *Vivo*; here, the officers addressed a report involving more frequent videotaping ("every day") and an explanation by the suspect (pointing an inoperable camera at a helicopter) that was, at best, unconvincing and which could have reasonably been interpreted by an officer as an attempt to cover up what he had been doing. The officers did not arrest Catledge, but their exercise of restraint in that regard does not mean that probable cause to do so did not exist; police are not required, of course, to arrest when there is probable cause to believe a crime has been committed.

Further, the Seventh Circuit has on a number of occasions "found probable cause to search a suspect's vehicle existed under the automobile exception based, in part, on an informant's tip." *United States v. Reaves*, 796 F.3d 738, 742 (7th Cir. 2015) (*citing United States v. Washburn*, 383 F.3d 638 (7th Cir. 2004). Although the police did not have direct information that Catledge was videotaping from his car, it was reasonable to infer from the caller's report and their observations on the scene that Catledge was operating out of his vehicle. *See, e.g., United States v. Charles*, 801 F.3d 855, 861 (7th Cir. 2015) (report of "person with a gun" in an alley created reasonable belief that suspect emerging from car had stashed the gun there); *Zahursky*, 580 F.3d at 522 (police had probable cause to search the plaintiff's vehicle for evidence of his efforts to solicit a minor to engage in sexual activity on the strength of his use of the automobile

17

to facilitate the crime). Here, the 911 report was that Catledge was sitting in a white Taurus station wagon at a specific intersection, and had been filming "at that location" every day. While perhaps not an express statement that Catledge was filming *from the car* every day, an officer could reasonably interpret the report that way. And with reason to believe that Catledge had been, day after day at the same location, training his video camera at women nearby, scaring one badly enough to make an emergency call to police, it cannot be said that no competent officer could have concluded that there was probable cause to search Catledge's car for evidence relating to that activity. Accordingly, defendants Martin and Kappel are entitled to qualified immunity.

\* \* \*

For the foregoing reasons, the defendants' motion for summary judgment is granted.

Date: December 15, 2015

John J. Tharp, Jr.
United States District Judge